IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| TOTAL PETROLEUM PUERTO RICO CORPORATION | CIVIL NO. 08-1876 (DRD) |
| Plaintiff | RE:  TRADEMARK INFRINGEMENT; TRADEMARK DILUTION; TERMINATION UNDER PETROLEUM MARKETING PRACTICES ACT; INJUNCTION; DECLARATORY JUDGMENT; DISPOSSESSION; COLLECTION OF MONEYS; AND DAMAGES |
| v. | |
| ANTONIA RENTA SANTIAGO, LUIS MARTÍNEZ COLÓN, ABIGAIL ALVALLE RENTA, and their CONJUGAL PARTNERSHIP | |
| Defendants | |

## OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

This matter is before the court on motion for temporary restraining order and/or preliminary injunction filed by plaintiff Total Petroleum Puerto Rico Corporation, formerly known as Gasolinas de Puerto Rico Corporation ("Total" and/or "Plaintiff"). (Docket No. 2, at 1, August 7, 2008). Defendants failed to respond to the Order to Show Cause duly notified to him issued by the Court on August 11, 2008, Docket No. 7, 9. Total is the tenant and franchisor of the gasoline service station at the center of this controversy, located at State Road 1 Km. 87.3, Barrio Coco Viejo, Salinas, Puerto Rico. (Docket No. 1, at 3-4, ¶ 10). Defendants are the franchisees of the gas station, Antonia Renta Santiago, Luis Martínez Colón and his wife, Abigail Alvalle Renta (collectively "Defendants"). (Docket No. 1, at 4-5, ¶¶ 11-13).

-2-

Plaintiff seeks to have Defendants "immediately surrender to Total the gasoline service station object of this case, including all the equipment and the Underground Storage Tanks therein located, during the pendency of this case, and [to instruct] Defendants to immediately comply with all the post termination covenants of the agreements between the parties." (Docket No. 2, at 1-2).

Having considered the documents filed by the parties and the reasons set forth below, this Court GRANTS Total's request for a preliminary injunction.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On August 7, 2008, Total filed a Verified Complaint against Antonia Renta Santiago, Luis Martínez Colón, his wife Abigail Alvalle Renta and the Conjugal Partnership between them. (Docket No. 1). Total states that Defendants were franchisees who were subleasing from Total the use of real property; that they also had a Lease Agreement which provided that the equipment and storage tanks installed by Total are of the sole and exclusive property of Total until Defendants repay the investment made by Total to the remodeling of the gasoline service station; and that the defendants had a supply agreement with Total to buy and resell their products along with the use of the Total trademarks, all to operate a gasoline service station. (Docket No. 1, at 5-14).

-3-

Total alleges "trademark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); for violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) [known as the Lanham Trademark Act of 1946]; and for trademark dilution in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c)." (Known as the Federal Trademark Dilution Act of 1995). (Docket No. 1, at 2, ¶ 3). Furthermore, jurisdiction is also alleged under the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801-09. (Docket No. 1, at 1, ¶ 1). Supplemental jurisdiction is invoked over state claims pursuant to 28 U.S.C. 1367.

### a.   The Lease Agreement

In the Verified Complaint, Total states that the Lease Agreement with Defendants for the use of the real property began on January 15, 2003. (Docket No. 1, at 6, ¶¶ 17-18). The Lease Agreement has a longevity of twelve years, ending in January 14, 2015. (Docket No. 1, at 6, ¶¶ 17-18).

The Lease Agreement provides that Total would provide Underground Storage Tanks for the storage of gasoline at the premises, three (3) gasoline pumps, one (1) diesel oil pump and the remodeling of the convenience store. (Docket No. 1, at 6-7, ¶ 20). Plaintiff states that Total made the aforementioned investment in order to improve the facilities and to increase the property value and the capacity to sell petroleum products. (Docket No. 1, at 6-7, ¶ 20). Plaintiff also states that the parties agreed that Total's

-4-

investment in said remodeling would be amortized by Defendants
based on a quantity of $0.02 per gallon of gasoline bought by
Defendants to be sold in the gasoline service station described in
the Lease Agreement. (Docket No. 1, at 6-7, ¶ 20). The Lease
Agreement also provides that the equipment installed by Total is to
be of the sole and exclusive property of Total until Defendants
repay the aforementioned total amount to Total.(Docket No. 1, at 6-
7, ¶ 20).

Plaintiff states that a promissory note for the sum of
$227,728.00, the amount invested by Total for remodeling the
gasoline service station, was executed by Defendants on April 15,
2003 in favor of Total. (Docket No. 1, at 7, ¶ 21). To this day the
Defendants owe Total $112,437.72 of said loan provided to
Defendants for the remodeling of the gasoline service station.
(Docket No. 1, at 7, ¶ 21).

The Lease Agreement provides that in the event of a
termination of the Lease, for any reason, Total is entitled to
receive the reimbursement of its investment. (Docket No. 1, at 7,
¶ 22).

The Lease Agreement provides that Total may assign such
agreement or sublease all or any part of the leased premises to a
third party. (Docket No. 1, at 7, ¶ 23).

-5-

**b.  The Sublease Agreement**

Plaintiff states that Total and Defendants entered into a Sublease Agreement pursuant to which Defendants were granted the right to retain possession over the leased premises and to operate a gasoline service station under the Total Trademark from such premises. (Docket No. 1, at 7, ¶ 24).

The Sublease Agreement also began on January 15, 2003 and had a duration of twelve (12) years, to end on January 14, 2015. (Docket No. 1, at 7-8, ¶¶ 25-26).

The Sublease Agreement provides Defendants' obligations, in addition to the others stipulated in said agreement. The following obligations, among others, are: that Defendants most devote their best efforts and dedication to preserve and promote the image of excellent service for the benefit of consumers; to operate the gasoline service station during the hours in which other gasoline service stations operate within the community where the gasoline service station is located; to comply with any and all applicable state and federal laws and regulations; and not to change the Total colors identifying the trademark of the property and equipment. (Docket No. 1, at 8-9, ¶ 29).

The Sublease Agreement provides that Total reserves the right of entrance to the property, for its representatives, agents or employees, in order to examine or inspect the property and all

-6-

matters or things that integrate or constitute it, and any Total property located on the premises. (Docket No. 1, at 9, ¶ 31).

The Sublease Agreement authorizes its termination in the event that Defendants abandon, vacate or fail to operate the gasoline service station for seven (7) consecutive days or fail to operate the gasoline service station during the hours in which other gasoline service stations operate within the community where the gasoline service station is located. (Docket No. 1, at 9-10, ¶ 33).

Furthermore, the Sublease Agreement provides that Defendants may not assign such agreement and/or sublease all or any part of the station or the leased premises without Total's written consent. (Docket No. 1, at 10, ¶ 34).

     c.   **The Supply Agreement**

Also beginning and ending on the same dates as the two Agreements discussed above, Total and Defendants executed a Supply Agreement under which Defendants were provided the right to buy and resell Total products and to operate a gasoline service station under such trademark. (Docket No. 1, at 11, ¶ 35).

The Supply Agreement provides the payment terms and conditions; and specifically, provides that: all invoices will include an additional charge of $0.02 per gallon for the payment of Defendants' loan for the remodeling of the gasoline service station provided by Total; sale and delivery of petroleum products are delivered F.O.B. at the gasoline service station within twenty-four

(24) hours of its requirement; and if Total grants credit to Defendants in a written document, defendants are required to pay within the credit terms, without a deferment of payment. (Dockets No. 1-2, Ex. 5 at 2-3 and Docket No. 1, at 10-11, ¶ 37).

Defendants shall pay under the terms of the Supply Agreement. Notwithstanding, in the event of default of payment, Total can modify the payment policy applicable to the dealer, pursuant to its billing policy. (Docket No. 1, at 11, ¶ 38). Pursuant to Total's billing practices, a dealer is allowed to pay by means of personal checks or a direct deposit to Total's bank account. However, if a dealer issues a check with insufficient funds, Total's billing policy establishes a series of norms and procedures to follow thereof; among which are: (a) If a direct deposit or check is denied or returned by the dealer's bank due to insufficient funds, the payment owed must be made by a means of a certified check plus a fee of $20.00; and Total will not deliver petroleum products until receipt of said certified check; (b) If a second check or direct deposit is denied or returned by the dealer's bank due to insufficient funds within the next three (3) months after the issuance of the first returned check or denial, the dealer is required to make its future payments by certified check for a period of three (3) consecutive months; (c) If a third check or direct deposit is returned or denied by the dealer's bank due to insufficient funds during the period of six (6) months, after the

-8-

dealer's first check was returned or direct deposit denied, the dealer is required to pay with a certified check indefinitely. (Docket No. 1, at 11, ¶ 38 and Docket No. 1, Ex. 6).

The Supply Agreement authorizes the termination of the agreement under the following circumstances, among others: the occurrence of an event which constitutes a breach of contract; if Defendants fail to make their best effort to comply with the provisions of such agreement; in the event that Defendants fail to comply with any and all applicable state and federal laws and regulations; in the event that Defendants adulterate the petroleum products; in the event that Defendants violate Total's trademarks; and if Defendants incur in illegal, fraudulent or deceitful actions or practices or in criminal conduct relevant to the operation of the gasoline service station. (Docket No. 1, at 12, ¶ 41).

The Supply Agreement also provides that Defendants are to exclusively use the Total MARKS and/or the marks, registered marks, trademarks, names, service distinctions, and/or patents that Total may authorize Defendants to use as part of the operation of the gasoline service station. (Docket No. 1, at 13, ¶ 43). The Supply Agreement further provides that in the event that Defendants fail to comply with the Agreement, Total can cease all deliveries, cancel all credits and/or terminate the Agreement. (Docket No. 1, at 13-14, ¶ 45) Furthermore, the Supply Agreement establishes that, if the Agreement is terminated, all debts of defendants would

-9-

become due immediately, without prejudice of Total's right to receive compensation for damages. (Docket No. 1, at 13-14, ¶ 45).

     **d.**   **Events of Default**

Total claims that Defendants failed to comply with the payment terms and conditions included in the Supply Agreement; for which reason, pursuant to Total's billing policies, Defendants were required to pay thereafter by certified check. (Docket No. 1 at 14, ¶ 46). However, Defendants failed to comply with such request either and did not pay and/or continued to make payments by means of checks lacking funds. (Docket No. 1 at 14, ¶ 46). Lastly, Total requested Defendants to pay each product delivery before or at the time of the respective delivery; but Defendants did not comply with said contractual covenant. Thus, Defendants left Total with no alternative but to terminate Defendants' franchise relationship.(Docket No. 1 at 14, ¶ 46).

Total further claims that throughout the parties' business relationship, "Defendants have repeatedly breached their essential obligations under the Sublease and Supply Agreements." (Docket No. 1, at 14, ¶ 47). In support of this claim, Total has included as exhibits in the Verified Complaint several letters between the parties. (Id. Ex. 7-14). Total contends that Defendants are in default and owe an amount of $155,901.72 to Total. (Docket No. 1, at 16-17, ¶ 56). After several fruitless attempts to collect the money owed, on July 24, 2008, Total informed Defendants that they

-10-

had until July 29, 2008 to pay the amounts owed. (Docket No. 1, at 18, ¶ 56).

Total states that in the past and in order to workout a solution to this situation, Total repeatedly provided accommodations to Defendants in order to facilitate the payment of amounts owed and to avoid the termination of the parties' business relationship. (Docket No. 1, at 17, ¶ 57).

On July 24, 2008, Total sent Defendants a warning letter stating that Total was providing them the last opportunity to pay all their debts, on or before July 29, 2008 at 12:00 p.m., before Total exercised its right to terminate the Sublease and Supply Agreements pursuant to the P.M.P.A. (Docket No. 1, at 18, ¶ 60).

Defendants did not take advantage of this last opportunity. Thus, due to Defendants' "repeated failure to pay Total the sums owed regarding the additional charge of $0.02 per gallon for the repayment of the loan provided to Defendants by Total under the Supply Agreement for the remodeling of the gasoline service station; failure to pay amounts owed for products sold and delivered under the Supply Agreement; ...failure to purchase and sell petroleum and/or other related products; ...and failure to operate the marketing premises for seven (7) consecutive days or such lesser period which under the circumstances constitutes an unreasonable period of time  . . . ," Total sent Defendants a written notice of termination of the franchise relationship,

-11-

effective immediately, on August 5, 2008. (Docket No. 1, at 18, ¶ 61). Despite this notice and Total's specific request that Defendants turn over the station, Defendants continued to retain possession over the gasoline service station, refused to pay the outstanding amounts owed to Total, did not sell petroleum products to the public and continued to use and exhibit the Total trade name and identifications after the termination. (Docket No. 1, at 19, ¶ 63).

     **e.**   **Total's Claims**

Total alleges that after termination Defendants continued to use the Total marks and/or colors in a way that is "causing confusion or mistake and is deceiving consumers as to the origin, the licensing, and the endorsing by Total of Defendant's operation of the gasoline service station." (Docket No. 1, at 20, ¶ 69). Accordingly, Total claims that these actions constitute "trademark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1)." (Docket No. 1, at 20, ¶ 71).

Total further contends that Defendants' acts "tend to represent falsely that Defendants' services and products are legitimately approved by Total which constitute a violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)." (Docket No. 1, at 21 ¶ 75).

Total invokes the Petroleum Marketing Practice Act ("PMPA") to support the termination. (Docket No. 1, at 22, ¶ 80).  Article

-12-

102(c)(8) of the PMPA specifically includes "failure by the franchisee to pay the franchisor in a timely manner when due all sums to which the franchisor is legally entitled" as justification for termination of a franchise relationship. (Docket No. 1, at 22-23, ¶ 83, emphasis omitted). Although the PMPA ordinarily requires ninety (90) day written notice to the franchisee of a termination or non renewal, it allows for a lesser period when ninety (90) days is unreasonable under the circumstances. (Docket No. 1, at 23, ¶ 84).

In light of the circumstances, Total argues that their termination notice should be "declared valid, legal and enforceable, effective as of the termination date, and in compliance with the applicable provisions of the P.M.P.A." (Docket No. 1, at 24, ¶ 87). Despite the termination notice, Defendants refused to surrender the service station, underground storage tanks and other equipment. (Docket No. 1, at 24, ¶ 88).

Total alleges that the totality of Defendants' aforementioned acts have caused injury and damages of such a nature that cannot be adequately compensated by an award of monetary damages. (Docket No. 1, at 24, ¶ 89). Total further asserts that it lacks an adequate remedy at law for all of its losses, and that it will continue to suffer irreparable damages unless defendants are "enjoined by this Court, pursuant to Rule 65 of the Federal Rules of Civil Procedure." (Docket No. 1, at 24, ¶ 90).

-13-

Consequently, Total filed a "Motion for Temporary Restraining Order and/or Preliminary Injunction." (Docket No. 2, August 7, 2008). Plaintiff based this motion on the statement of facts in the "Verified Complaint" filed on the same date and the accompanying exhibits. (Docket No. 2, at 2). In the motion for temporary restraining order and preliminary injunction, Total argued that irreparable injury exists and will continue if a preliminary injunction is not issued:

> Total has no adequate remedy to avoid the total destruction of more than a decade of presence in one of Puerto Rico's competed gasoline markets nor the unauthorized use of its trademarks and property, and there is no remedy at law for such harm. (Docket No. 2, at 24, ¶ 2).

Furthermore, Total argued that "the continued exhibition of Total MARKS after the termination of the franchise results in the tarnishment of the aforementioned marks." (Docket No. 2, at 25, ¶ 3.) A show cause hearing on the matter of preliminary injunction was set for August 18, 2008. (Docket No. 7). At the hearing held on August 18, 2008, Defendants did not appear before this Court, although they were properly served. (Docket No. 9).

As shown by Exhibits 5-14 of the Verified Complaint (Docket No. 1), Defendants have repeatedly failed to meet their obligations under the Supply Agreement as to payments. (Docket No. 1, at 14-18, ¶¶ 48-59). Furthermore, Total showed its good faith by attempting an amicable workout solution to the situation and hence to continue the relationship. (Docket No. 1, at  17, ¶ 57). Plaintiff finally

-14-

presented the termination notice providing Defendants a day to vacate the premises. (Docket No. 1, Ex. 15).

Since Total did not provide the required ninety (90) days notice required by section 2804(a)(2), the termination is required to comply with section 2804(b)(1)(B) to be valid. Total has not started another franchise in Defendants' stead; Total has complied with the requirements of section 2804(c), in that the notification was in writing, was hand delivered, was posted by certified mail, and contained all the necessary provisions. (See Docket No. 1, at 19, ¶ 62). Therefore, Plaintiff has satisfied the requirements of section 2804 and in turn has satisfied section 2802(b)(1)(A).

Total has further satisfied the requirements of sections 2802(b)(1)(B) and (b)(2). Under section 2802(b)(2)(C), a franchisor may base termination or non-renewal on "[t]he occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or non-renewal of the franchise is reasonable. . . ." 15 U.S.C. § 2802(b)(2)(C). Section 2802(c)(8) includes one of the qualifying events as "failure by the franchisee to pay to the franchisor in a timely manner when due all sums to which the franchisor is legally entitled[.]" 15 U.S.C. § 2802(c)(8). The above referenced exhibits show that Plaintiff meets the requirements of this particular provision of the PMPA. (Docket No. 1, Ex. 5-14).

-15-

The abovementioned satisfies the regulations of the PMPA for terminating a contract, such termination is presumed to be reasonable, and the termination of the contract was valid. See Desfosses v. Wallace Energy, Inc., 836 F.2d 22, 26 (1st Cir. 1987).

**B. Preliminary Injunction**

Total seeks that Defendants "immediately surrender the station, the Underground Storage Tanks, and all the equipment therein to Total, to immediately comply with all other post-termination covenants of the Sublease and Supply Agreements, and to refrain from using the Total MARKS." (Docket No. 2, at 34, ¶ 2).

I. INJUNCTIVE RELIEF

The First Circuit uses a quadripartite test for determining whether litigants are entitled to preliminary injunction redress. Under this framework, trial courts must consider (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest. New Comm Wireless Services, Inc. v. SprintCom, Inc., 287 F.3d 1, 8, 9 (1st Cir. 2002); Ross-Simmons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir. 1996) (citing Weaver v. Henderson, 984 F.2d 11, 12 & n.3 (1st Cir. 1993); Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 5 (1st Cir. 1991)); see also Ocean Spray

-16-

Cranberries, Inc. v. PepsiCo, Inc., 160 F.3d 58, 60-61 (1st Cir. 1998); DeNovellis v. Shalala, 135 F.3d 58, 62 (1st Cir. 1998); Telerep Caribe, Inc. v. Zambrano, 146 F. Supp. 2d 134, 137 (D.P.R. 2001).

### 1.   LIKELIHOOD OF SUCCESS ON THE MERITS

In the realm of the First Circuit the requisite of probability of success is of critical and strict importance.

"The **sine qua non** of that formulation is whether plaintiffs are likely to succeed on the merits. In the ordinary course, plaintiffs who are unable to convince the trial court that they will probable succeed on the merits will not obtain interim injunctive relief." Weaver v. Henderson, 984 F.2d at 12. See also New Comm Wireless Services, Inc. V. SprintCom, Inc., 287 F.3d at 9. ("The sine qua non of this four-part inquiry is likelihood of success on the merits: If the moving party can not demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity" citing Weaver id.) See also Auburn News Co. V. Providence Journal Co., 659 F.2d 273, 277 (1st Cir. 1998) ([T]he probability of success component has loomed large in cases before this court.")

-17-

To determine the, **sine qua non** requisite, likelihood of Plaintiff's success on the merits of the claim[1], the Court must examine the claims under both the PMPA and the Lanham Act.

**i.   PMPA**

As previously discussed, Total's allegations include a valid termination of the contract under the PMPA, and the demand of the return of the property and equipment in possession of the defendants, who continued to use the Total MARKS after termination; thus depriving Plaintiff of a federally-protected right to its property. The Defendants are obliged to comply with all of the post-termination obligations under the agreements to which they are a part, including the surrender of the premises. The defendants have utterly failed to comply with the payment schedules contained in the contract notwithstanding plaintiffs' good faith efforts to aid defendants in payment. A substantial amount of money remains in arrears. Therefore, there is a substantial likelihood of Plaintiff succeeding on the merits of its claims under the PMPA.

**b.   FTDA AND THE LANHAM ACT**

Total claims that Defendants after termination continued using the Total MARKS, representing themselves as a Total franchise, and continued promoting and advertising their business with the Total MARKS. (Docket No. 1, at 20, ¶ 68). Plaintiff further claims that

---

1.   **Sine qua non:** Without which not. That without which the thing cannot be. An indispensable requisite or condition. Black's Law Dictionary, 1990.

-18-

such actions cause confusion or mistakes among consumers as to the origin, licensing and endorsing by Total of Defendants' operation of the gasoline service station. (Docket No. 1, at 20, ¶ 69).

In trademark infringement cases, the movant must show that prospective buyers/clients are "likely to be confused as to the product's source." I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 43 (1st Cir. 1998). "[T]he law has long demanded a showing that the allegedly infringing conduct carries with it a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care." Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Winship Green Nursing Ctr., 103 F.3d 196, 201 (1st Cir. 1996.)

In examining the likelihood of confusion, the First Circuit focuses on eight factors:

> (1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; and (8) the strength of the plaintiff's mark. . . . No one factor is necessarily determinative, but each must be considered. I.P. Lund Trading ApS v. Kohler Co., 163 F.3d at 43 (quoting Boston Athletic Ass'n v. Sullivan, 867 F.2d 22, 29 (1st Cir. 1989)).

It is axiomatic that proof of actual confusion is not required in order for a court to conclude that confusion is likely.

-19-

*Victoria's Cyber Secret Ltd. Partnership v. V Secret Catalogue, Inc.*, 161 F.Supp.2d 1339 (S.D.Fla. 2001).

First, the similarity of the marks and the similarity of goods inquiry are the same. The franchisee continued to use the trademark of the franchisor. There is no evidence that consumers had any notice that the franchise relationship was terminated, or that the right to sell goods sold under that trademark has been lost. The continued use of the Total MARKS and/or colors can cause consumers to buy products in reliance on the misused trademark.

As far as similarity is concerned, since the parties are offering "virtually the same goods . . . 'under this factor, there is a strong likelihood of confusion.'" *Boston Atletic Assn. v. Sullivan*, 867 F.2d at 30, (quoting *Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F.2d 812, 818 (1st Cir. 1987)).

The next three factors are treated together as a practice in this circuit. *Aktiebolaget Electrolux v. Armatron Int'l, Inc.*, 999 F.2d 1, 3 n.3 (1st Cir. 1993)(citing *Boston Athletic Ass'n v. Sullivan*, 867 F.2d at 30; *Volkswagenwerk Aktiengesellshaft v. Wheeler*, 814 F.2d at 818; *Pignons S.A. v. Polaroid Corp.*, 657 F.2d 482, 488 (1st Cir. 1981)). Plaintiff and Defendants operate in the same trade. The classes of prospective purchasers are identical. The same customers that have used the station since its start are the same customers Defendants hope to attract. "Few harms are more corrosive in the marketplace than the inability of a trademark

-20-

holder to control the quality of bogus articles thought (erroneously) to derive from it." Hypertherm, Inc. v. Precision Prod., Inc., 832 F.2d 697, 700 (1st Cir. 1987).

Since proof of actual confusion is not required in order for a court to conclude that confusion is likely, consumer confusion appears likely: consumers had no real notice of the fact that the gasoline service station was no longer a Total station after the termination of the franchise relationship.

Finally, in order to evaluate a mark's relative strength the First Circuit has used the following factors: "the length of time a mark has been used and the plaintiff's relative renown in its field; the strength of the mark in plaintiff's field of business . . . and the plaintiff's actions in promoting its mark." Boston Athletic Ass'n v. Sullivan, 867 F.2d at 32 (internal citations omitted). Total has owned their trademarks for a significant length of time, and further the marks are easily identifiable in its field of business. Defendants simply have no right to use Plaintiff's marks.

After examining the above factors, the likelihood of confusion of Plaintiff's trademark is very high, and therefore, Plaintiff has demonstrated likelihood of success on the merits.

## 2. <u>SIGNIFICANT RISK OF IRREPARABLE HARM</u>

This criteria "must not be assumed, it must be demonstrated... speculation injury does not constitute a showing of irreparable harm." Narragansett Indian Tribe v. Guilbert, 934 F.2d at 6, 7. Only

-21-

a viable threat of serious harm which can not be undone authorizes exercise of the court's equitable power to enjoin before the merits are fully determined." <u>Parks v. Dunlop</u>, 517 F.2d 785 (5th Cir. 1975).

Plaintiff contends that irreparable harm will result absent an injunction because (1) there is no adequate remedy at law for the harm to its reputation in the area; (2) Total has been prevented from exercising its right to use the gasoline service station and use it for commercial gain; Total cannot monitor the tanks and equipment to ensure compliance with environmental standards; difficulty of proving damages; and (4) because of the trademark harms previously discussed. (Docket No. 2, at 24-25.)

An injury will only be considered irreparable if no adequate remedy for the injury exists at law. See <u>Foxboro Co. v. Arabian Am. Oil Co.</u>, 805 F.2d 34, 36 (1st Cir. 1986); see also 11A Charles Alan Wright, et al., Federal Practice and Procedure § 2948.1, at 149-51 (2d ed. 1995). Monetary damages are generally not considered irreparable injuries. See <u>DeNovellis v. Shalala</u>, 135 F.3d at 64 ("[A] temporary loss of income which may be recovered later does not usually constitute irreparable injury."). It is not necessary for plaintiff to establish that denial of injunctive relief would be fatal to its business; it is sufficient for plaintiff to show that injury is not accurately measurable, given that irreparable harm is a natural sequel. See <u>Ross-Simons of Warwick, Inc. v. Baccarat, Inc.</u>, 102 F.3d at 19 (citing e.g., <u>K-Mart Corp. v. Oriental Plaza,</u>

-22-

Inc., 875 F.2d 907, 915 (1st Cir. 1989)). Evaluating irreparable harm and its likelihood of success on the merits must be considered together. The greater the likelihood of success on the merits, the less required showing of irreparable harm. "[W]hen the likelihood of success on the merits is great, a movant can show somewhat less in the way of irreparable harm and still garner preliminary injunctive relief." E.E.O.C. v. Astra U.S.A., Inc., 94 F.3d 738, 743 (1st Cir. 1996).

Plaintiff has complied with the required showing that without the preliminary injunction it would lose incalculable revenues and sustain harm to its goodwill. Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d at 19. The incalculable damage is lost revenues, harm to plaintiff's reputation, and alienation of future customers. "By its very nature injury to goodwill and reputation is not easily measured or fully compensable in damages." Id. at 20 (citing K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d at 915).

Defendants' continued occupation of Plaintiff's property and use of its equipment deprives Total of the ability to make productive use of this particular site. In the absence of an injunction, Plaintiff would face substantial risks through its immediate inability to properly monitor and exercise control over the underground storage tanks, pumps, and related equipment at the site. A denial of injunction would expose Plaintiff to general liability, and in particular, liability regarding environmental

-23-

regulations. These issues are enough to show that the Plaintiff would suffer irreparable harm absent an injunction before a court ruling on Plaintiff's claims.

**3.    BALANCE OF HARDSHIPS**

This criteria requires the court to examine, performing a balancing, on which side does equity lie.  "[T]he heart of the matter is whether 'the harm caused plaintiff without the injunction, in the light of the plaintiff's likelihood of eventual success on the merits, outweighs the harm the injunction will cause the defendants'." DeNovellis v. Shalala, 135 F.3d at 77.  In other words, the court should focus upon the hardship to the movant if an injunction does not issue as contrasted with the hardship to the nonmovant if it does, and the effect of the court's action on the public interest.  Matos ex rel. Matos v. Clinton School District, 367 F.3d 68, 73 (1st Cir. 2004).  Finally, this criteria is the result of a comparison between the injury suffered by plaintiff outweighing any harm which granting injunctive relief would inflict on the defendant.  Planned Parenthood League v. Bellotti, 641 F.2d 1006, 1009 (1st Cir. 1981).

"Weighing the hardships of each party is a fact-driven exercise." Telerep Caribe, Inc. v. Zambrano, 146 F. Supp. 2d at 145. While Defendants will suffer the hardship of ceasing operations until a ruling has been made in this case, Defendants do not have

-24-

the right to use the Total property, storage tanks, equipment or trademarks in violation of the terminated franchise agreement. The actual damage to Total's reputation is significant, and will only increase with time, during which Defendants' possession of Plaintiff's premises is clearly contrary to law. Trademark law is designed to "quickly and easily assure a potential customer that this item–the item with this mark–is made by the same producer as other similarly marked items that he or she liked (or disliked) in the past." Qualitex Co. v. Jacobson Prod. Co., 514 U.S. 159, 164 (1995) (emphasis in the original). Whether intentionally or not, Defendants' actions are harmful to both consumers and Plaintiff. The Defendants possess a gasoline service station which by its very nature sells gasoline, and in this case, Total's gasoline. Defendants' gasoline service station sells no gasoline. For these reasons, the balance of hardships leans in favor of Plaintiff.

**4.   PUBLIC INTEREST**

The criteria requires the Court to weigh where does the public interest lie by the granting or the denial of the injunctive relief. It constitutes a balancing of interest between the granting or the denial based on public interest. (Likelihood of success on the merits; whether the public interest would be better served by issuing than by denying the injunction). Massachusetts Coalition of Citizens with Disabilities, et al., v. Civil Defense Agency and Office Emergency Preparedness, 649 F.2d 71, 74 (1st Cir. 1981).

-25-

The public interest weighs heavily in Plaintiff's favor. Not only is Plaintiff's trademark being harmed, but any potential customer who relies on the strength of Total's trademarks and quality of product is being erroneously induced into purchasing petroleum products from this particular gas station, which no longer sells gasoline. Furthermore, the continued possession by a sublessee of a property after the sublease has been validly terminated is contrary to the public interest, in this particular case more so since such possession includes underground gasoline storage tanks. Such tanks require strict testing, record keeping, monitoring, and sampling and Plaintiff cannot delegate its liability for soil contamination or violation of environmental laws under the circumstances.

### III. <u>CONCLUSION</u>

Plaintiff has shown that it is likely to prevail on the merits based upon Defendants' violations of the Petroleum Marketing Practices Act, the Federal Trademark Dilution Act, and the Lanham Act. Plaintiff's injury cannot be accurately measured under the circumstances and such injury continues each day plaintiff is denied possession of the gasoline service station no longer selling its product. Were the Court to decide that somehow the injury is repairable, or measurable, the strength of likelihood of success would yet carry controlling weight. Plaintiff is experiencing hardship with the current condition of the gasoline service station

-26-

and the violations of law. The Defendants would suffer the normal results of someone who is no longer running an operation under the contractual obligations agreed to. Finally, the public interest is not served by trademark harm, misleading customer inducement, violation of environmental laws (the lack of
examination of the underground tanks to detect gas, and potential leakage of gasoline) and the ignoring of contractual obligations.

For the foregoing reasons, the Court GRANTS Plaintiff's motion for the issuance of a preliminary injunction as follows:

Defendants Antonia Renta Santiago, Luis Martínez Colón, Abigail Alvalle Renta, their agents, employees, and assignors are directed to: (1) immediately surrender the gasoline service station, known by the trademark name of Total located at State Road 1 Km. 87.3, Barrio Coco Viejo, Salinas, Puerto Rico, including the station, the underground storage tanks, and all equipment located in such premises belonging to Plaintiff; (2) immediately comply with all post-termination covenants of the Sublease and Supply Agreements to which the Defendants are signatories; and (3) immediately cease using the well-known Total marks.

Plaintiffs are entitled to take immediate possession of the gasoline station object of the instant complaint.

-27-

A bond in the amount of $100,000.00 is to be deposited in court within the next twenty-four (24) hours by plaintiffs to respond for any potential damages caused to defendants. Fed.R. 65(c).

**IT IS SO ORDERED.**

At San Juan, Puerto Rico, this 26TH day of August, 2008.

s/ Daniel R. Domínguez
**DANIEL R. DOMINGUEZ**
**U.S. DISTRICT JUDGE**